**FILED**

NOV 2 - 2007

U.S. BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| ITC HOMES, INC., an Arizona corporation, | Case No. 4-06-00053-EWH |
| | **MEMORANDUM DECISION** |
| Debtor. | |

## I. INTRODUCTION

The issue to be decided is whether an escrow deposit is refundable to the buyers of a to-be-built custom house that the Debtor cannot build. Based on the evidence presented and applicable law, the deposit is refundable, but because the deposit was released, with the buyers' consent, from an escrow account, there is no deposit separate from the property of the bankruptcy estate which can be refunded to the buyers. Accordingly, the buyers hold a general, unsecured claim against the estate equal to the amount of their deposit plus their reasonable attorneys' fees. The reasons for these conclusions are explained in the balance of the Memorandum Decision.

## II. FACTS AND PROCEDURAL HISTORY

On September 11, 2005, John and Sharon Rebeske ("Rebeskes") executed a Real Estate Sales Contract ("Sales Contract") with ITC Homes, Inc. ("ITC") for the construction of a custom house on a lot in Unit 29 of a subdivision known as Santa Rita

Estates located near Vail, Arizona. At the time the Sales Contract was executed, the Rebeskes made an initial escrow deposit of $5,000. The Sales Contract provided for an additional $20,000 deposit when the parties agreed on a final price for the custom house.

On October 9, 2005, the parties agreed on a price of $475,000, and the Rebeskes paid an additional $20,000 for a total escrow deposit of $25,000 ("Deposit"). The parties disagree about the purpose of the Deposit. ITC asserts that it was a non-refundable, design fee charged to the Rebeskes because their house was custom rather than one of the standard models that ITC was building. The Rebeskes deny that they ever agreed to pay a non-refundable design fee and assert that the Deposit was to be applied to the purchase price or refunded to them in the event of an ITC breach.

Over the next few months, the Rebeskes met with an ITC representative to finalize the design for their house. On January 26, 2006, ITC filed for Chapter 11 relief. The Chapter 11 filing was caused by a dispute between ITC and an entity known as M&S Unlimited, L.L.C. ("M&S"), which claimed to have ownership rights in Unit 29 where the lot for the Rebeskes' custom house was located. Unit 29 was also the subject of a number of permitting problems with Pima County. ITC informed the Rebeskes that the reason for repeated construction delays was the permitting problems with Pima County, but did not mention ITC's dispute with M&S as imperiling the construction of their house.

On March 23, 2006, during a meeting with Ron Amiran ("Amiran"), the principal of ITC, the Rebeskes signed a letter ("Release Letter") directing the escrow agent to release their escrow deposit to ITC as a "full release of the deposit for completed

2

design." Amiran initialed the letter. In June 2006, the escrow agent sent ITC the Deposit.

After protracted litigation, ITC and M&S entered into a settlement agreement in March 2007. The terms of that settlement agreement were incorporated into the Debtor's First Amended Plan of Reorganization, which was confirmed, as modified, on March 9, 2007. Under the terms of the settlement with M&S, all of Unit 29 was reconveyed to M&S free and clear of all liens, claims and encumbrances. On March 14, 2007, pursuant to the terms of the settlement, ITC gave notice of rejection of a number of executory contracts, including the Sales Contract.

On May 9, 2007, the Rebeskes filed an application for refund of the Deposit in which they asserted that the Sales Contract should not be terminated until they received a refund of the Deposit. ITC responded on May 31, 2007, asserting that the Deposit was a non-refundable design fee. An evidentiary hearing was held on September 25, 2007. Post-trial briefs were filed on October 19, 2007.

## III. ISSUE TO BE DECIDED

1.    Is the Deposit refundable?

2.    If the Deposit is refundable, what is the extent and nature of the Rebeskes' claim?

## IV. STATEMENT OF JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and § 157(2)(B).

3

# V. DISCUSSION

## A. Refundability of the Deposit

The Sales Contract does not contain a separate section regarding the rights of the parties to the Deposit. Section 7 of the Sales Contract provides that in the event of a breach by the Rebeskes, all sums paid to ITC are forfeited. It further provides that in the event of a default by ITC, the Rebeskes could cancel the Sales Contract and "have all monies paid under the agreement refunded to it." Paragraph 15-G of the Sales Contract provides that the Sales Contract cannot be altered, amended or changed, except by a writing signed by the parties. The contingency section of the Sales Contract provides that if an agreement was reached regarding a custom house, an "additional custom home deposit of $20,000 will be required for a total earnest money deposit of $25,000." There is no provision stating that the additional deposit or the initial deposit is non-refundable because the Rebeskes' house was a custom house.

ITC asserts that the parties always understood that because the Rebeskes ordered a custom house, the Deposit would be non-refundable. If, as Amiran testified, the parties understood from the beginning of their relationship that the Deposit was a non-refundable design fee, that evidence is barred by the Parol Evidence Rule. See Formento v. Encanto Business Park, 154 Ariz. 495, 498, 744 P.2d 22, 25 (Ariz. App. 1987) (Agreements allegedly made prior to or contemporaneous with the execution of a written agreement are barred under the Parol Evidence Rule). Even if the Parol Evidence Rule does not apply, Amiran's testimony, by itself, was insufficient to establish such an understanding. The Rebeskes denied that such an understanding existed and

4

nothing in any of the documents supports ITC's claim that the Deposit was a non-refundable design fee.

In the alternative, ITC asserts that the Release Letter was either:

1. a new binding contract;

2. an amendment; or

3. a waiver by the Rebeskes of the right to have the Deposit refunded in the event of a breach by ITC.

The Release Letter was not a new contract because when it was executed, there was no new consideration exchanged between the parties. See Schade v. Diethrich, 158 Ariz. 1, 8, 760 P.2d 1050, 1057 (1988). The Rebeskes had already paid $25,000 to the escrow agent and ITC had already executed the Sales Contract obligating it to build the Rebeskes a house.

The Release Letter, which was a letter to the escrow agent, is also insufficient to constitute a binding amendment to the Sales Contract. Under Arizona law, a contract to sell real estate and an escrow are not the same thing. Allan v. Martin, 117 Ariz. 591, 592, 574 P.2d 457, 458 (1978). The Allan court found:

> [T]he escrow instructions are not part of the underlying real estate sales contract and the terms of the instructions cannot alter or modify the sales contract unless the parties specifically and clearly state such alteration or modification in writing with specific reference to the fact it changes the original contract.

Id. (emphasis added). The Release Letter does not meet the requirements of Allan v. Martin, and is not, therefore, an amendment to the Sales Contract.

5

Finally, the Release Letter cannot operate as a waiver by the Rebeskes of their right to receive a refund of the Deposit because it was executed without any disclosure from ITC of the risk that M&S might become the owner of Unit 29. Under Arizona law, a seller has a legal duty to disclose to a buyer material facts about the property being purchased. Hill v. Jones, 151 Ariz. 81, 84-85, 725 P.2d 1115, 1118-19 (App. 1986). When the Release Letter was executed, ITC was involved in litigation with M&S which, should M&S have prevailed, would have made performance of the Sales Contract by ITC impossible because ITC would no longer have owned Unit 29. Amiran testified that he did not consider the litigation with M&S to be a real threat, but the settlement between M&S and ITC did result in M&S becoming the owner of Unit 29. The pending litigation with M&S was, therefore, a material fact which was not disclosed to the Rebeskes when they executed the Release Letter.

The failure of ITC to disclose the claims of M&S to Unit 29 is fatal to any claim of waiver. A waiver requires an intentional relinquishment of a known right. Northern Arizona Gas Service, Inc. v. Petrolane Transport, Inc., 145 Ariz. 467, 476, 702 P.2d 696, 705 (Ariz. App. 1985). The Rebeskes could not have had the necessary intent to waive their rights to a refund of the Deposit when they did not know of the potential loss of Unit 29 to M&S, which would have meant that construction of their house would become impossible. Since the Rebeskes' right to a refund of the Deposit is contractual, the Rebeskes are also entitled to recover their reasonable attorneys' fees pursuant to A.R.S. § 12-341.01.A.

6

B. The Rebeskes Hold a General Unsecured Claim Against the Estate

The Rebeskes have filed an application for a refund of the Deposit. However, there is no longer any identifiable deposit for them to recover. Up until March 2006, the escrow agent held the Deposit. Funds held in an escrow account prior to bankruptcy are generally not considered to be property of the estate at all. See 5 Collier on Bankruptcy, ¶ 541.09A[2], p. 541-54 (15th ed. rev. 2005). Until the Release Letter was issued, both the Rebeskes and ITC held contingent interests in the Deposit. However, once the funds were released, they became property of the ITC bankruptcy estate, and the Deposit lost its character as a separate deposit.[1] The Sales Contract is a prepetition contract. 11 U.S.C. § 365(G) treats a rejected contract as if the contract was breached "immediately before" the date of the filing of the petition which has the effect of giving the holder of a rejected executory contract, a prepetition general unsecured claim against the estate. In re Bergt, 241 B.R. 17, 25 (Bankr. D. Alaska 1999). Accordingly, the Rebeskes hold a general unsecured claim against the estate, not a right to receive an identifiable fund of money.

## VI. CONCLUSION

The Rebeskes are entitled to a general unsecured claim for the Deposit plus, after proper application, an amount for reasonable attorneys' fees. The foregoing

[1] 11 U.S.C. § 541(a) provides in relevant part:
The commencement of a case under Section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(7) Any interest in property that the estate acquires after the commencement of the case.

7

1  constitutes the court's finding of facts and conclusions of law. A separate order

2  consistent with this decision will be issued this date.

3  DATED this 2nd day of November, 2007.

4

5

6

7  HONORABLE EILEEN W. HOLLOWELL
   UNITED STATES BANKRUPTCY JUDGE

8

9  Copy mailed this 2nd day of
10 November, 2007 to:

11 Scott D. Gibson, Esq.
   Gibson, Nakamura & Green, PLLC
12 2941 N. Swan Rd., Suite 101
13 Tucson AZ 85712
   Attorneys for Debtor

14

   Michael J. Butler, Esq.
15 Michael A. Fleishman, Esq.
   Butler & Associates, P.L.C.
16 145 South 6th Avenue
17 Tucson, AZ 85701
   Attorneys for Movants John and Sharon Rebeske

18

   Christopher J. Pattock, Trustee
19 Office of the U.S. Trustee
20 230 North First Ave., Suite 204
   Phoenix, AZ 85003-1706

21

22 By: _____
   Judicial Assistant

23

24

25

26

27

28                                8